[No. 9446.   Department Two.   June 23, 1911.]

SEATTLE, RENTON & SOUTHERN RAILWAY COMPANY, *Appellant,* v. SEATTLE-TACOMA POWER COMPANY, *Respondent.*[1]

ACCORD AND SATISFACTION—PARTIAL PAYMENTS—CONSIDERATION—PROTESTS—EVIDENCE—SUFFICIENCY. Under a contract for an electric current at a specified rate, which further provided for a minimum payment of $1,000 per month, there is no accord and satisfaction, every essential feature being lacking, where checks for $1,000 were sent monthly with a claim of a payment in full, but the power company returned the vouchers therefor unsigned with the statement that the payments were applied upon account only, and in the dispute that arose, the customer expressed a willingness to pay whatever moneys were justly due, to take up and settle the question, and continued making the payments of $1,000, confessed as due, until such time; there being no consideration for an accord and satisfaction.

ELECTRICITY—SUPPLY—ACTION FOR PRICE—CONTRACT—METHOD OF CALCULATION—DEFENSES. Where the amount due from a railroad company to a power company for electric current was calculated in one of the two methods provided for in the contract, the railroad company cannot be heard to say that it was not a proper method; and it is immaterial that bills rendered for current varied slightly from the evidence, under an accurate computation by instruments as against computations by eye reading at the time the bills were prepared.

[1]Reported in 116 Pac. 289.

Same—Defenses. Where a railroad company, a heavy consumer of electric current, never tested a meter for accuracy, as it might have done under its contract for power, in an action for the price of current, little credit should be given to its claim of inaccuracy of the meter.

Same—Supply—Performance of Contract. The fact that the voltage dropped a little below that required by a contract for electric current, on a few occasions, is no defense to an action for the price, where the consumer was not damaged by lack of power and received all the current it required.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered September 29, 1910, upon findings in favor of the defendant, after a trial on the merits before the court without a jury, in an action for equitable relief. Affirmed.

*Will H. Thompson* and *Morris B. Sachs*, for appellant.

*Peters & Powell* and *Norwood W. Brockett*, for respondent.

Morris, J.—This action is a controversy between these respective companies over the amount of electric power furnished by the power company to the railway company, and arose in this manner: In April, 1906, a written contract was entered into between the two companies for the furnishing of electric power to be used by the railway company in the operation of its street car system from Seattle to Renton, the incidental lighting and machinery of its shops, and for sale in small units to consumers not within reach of the power company's lines. The contract fixed the price, the place, and pressure at and under which the current was to be delivered, the term of its existence at twenty years, the method of measurement, and the maximum and minimum horse power to be furnished. It was further provided that the minimum price should be $1,000 per month, which sum it was agreed should be paid by the railway company each month during the life of the contract, irrespective of the amount furnished, except for such interruptions to its service as might be caused by public servants, strikes, or other causes beyond the control

of the railway company.   More extended reference will be
made to the contract as it will be found necessary in the dis-
cussion of the questions raised by the appeal.   The power was
furnished and used continuously from the making of the
contract until October 24, 1907, when the power company,
claiming the railway company was in arrears for power fur-
nished up to that time, to the amount of several thousand
dollars, threatened to discontinue furnishing power unless
these arrears were paid.   The railway company thereupon
brought this action, seeking to enjoin the power company
from discontinuing its service.   A temporary injunction was
issued, and the power company answered, setting up its
counterclaim in the amount claimed to be due, and by sup-
plemental answer continuing its claim up to the time of
trial; and demanded judgment accordingly.   The railway
company contested the right of recovery, claiming a breach
of the contract on the part of the power company.   Trial
was had upon these issues, resulting in judgment in favor of
the power company upon its counterclaim, in the sum of
$46,674.70, and the railway company appeals.

The only question involved in the appeal is one of fact—al-
leged error in the findings of the court as to the amount of
power furnished and the amount due therefor; save in one
particular in which a question of law is submitted, growing
out of the payment monthly of $1,000, during the contro-
versy, it being suggested that the payment and receipt of
this amount was in law an accord and satisfaction.   We will
dispose of this claim first.   The provision of the contract
calling for the payment of this $1,000 is as follows:

"Should the amount to be paid by the railway company to
the power company for services rendered hereunder as cal-
culated by the method provided in sub-paragraph A of this
paragraph Fifth [which fixed the price at the rate of one
cent per kilowatt hour, meter measurement] and also as cal-
culated by the method provided in sub-paragraph B hereof
[providing that the total price to be paid any month at the

21—63 WASH.

rate of one cent per kilowatt hour should not be less than an amount derived by multiplying the average maximum consumption expressed in horse power, during two fifteen-minute intervals of time in each month when the railway company's demand was greatest, by the rate of three dollars per horse power] be less than $1,000, then the railway company agrees that it will pay a minimum of $1,000 for service during that month. That is in any event, anything elsewhere in this agreement (except in paragraph tenth hereof) to the contrary notwithstanding. Railway company agrees to pay power company a minimum amount of $1,000 per calendar month for each and every month of the life of this agreement."

Some time after the dispute arose as to the proper method of determining the monthly bills, the railway company adopted a practice of mailing the power company each month its check for $1,000, accompanied with the statement that such sum was in full payment for the month covered by the remittance. This accompanying statement, which was intended as a voucher, would be returned by the power company unsigned, and accompanied by a further statement that the amount was received as payment on account merely, and for no other purpose. During this method of payment, letters passed between the companies, in which the railway company reiterated its position that the checks were sent upon the theory of full payment and under no other conditions; the power company as earnestly contending the amount was received and accepted as a payment on account and for no other purpose. The last letter of the railway company, making any protest to the application of the $1,000 by the power company, is dated December 12, 1906, and is in reply to a letter of the power company of December 11, stating its intention to apply the payment on account only. This seems to have ended the controversy, except that the railway company continued each month to send its $1,000 in full settlement, with an enclosed receipt voucher, which was as uniformly returned unsigned by the power company. So that, subsequently to December, 1906, the railway company had

full knowledge that the power company would not accept the $1,000 each month except as a part payment on account. As further significant of the attitude of the railway company in making this monthly payment, we quote from its letter to the power company under date of November 28, 1906, in which, in referring to these payments, it says:

"As per my promise to your Mr. Workman on November 27, 1906, will say that after consultation with the directors of the Seattle, Renton & Southern Railway Company, it has been decided by the company to stand by the offer made by me of paying the amount designated in our contract as the minimum amount, namely $1,000 per month until such time as your company has put itself in condition to comply with the terms of the contract between our two companies. Enclosed therefore I send you check for $2,000, which is a trifle in excess of the sum which would be due under such minimum payment up to November 1, 1906."

These payments of $1,000 monthly seem to have commenced with May, 1907. Prior to that time the railway company had mailed to the power company its check in such an amount as it conceived to be the amount due under the kilowatt-hour readings of its meters, and which in each instance, subsequent to January 1, 1907, was a less sum than the bill rendered by the power company. On October 26, 1907, which was after the commencement but before the trial of this action, the railway company wrote a letter to the power company, in which we find this language:

"This company is willing to pay whatever moneys are justly due and owing to your company for power furnished to it, such amounts to be determined by the method laid down by the contract and not by the arbitrary decision of the officials of your company as to such method. This company has paid your company in full for the period from April 24, 1906, until February 1, 1907, and also from June 1, 1907, to date; but during the period from February 1 to June 1, as per our correspondence, we are willing to take up and settle under the method provided by the contract for power used during such months if there is any additional sum owing

beyond what has been paid according to our meter reading for such period. As the writer informed your Mr. Workman over a year ago that this company was anxious to have a determination of the meaning of such contract settled so that both parties would know exactly what rightful charges could be made, we are still willing and anxious to have, if possible, a friendly adjustment of our differences and settle once for all what is the meaning of the contract, regarding the method of determining the monthly bills. We are perfectly willing to have the present case set down and tried as our pleadings have been drawn, so as to settle absolutely the rights of the parties under the terms of such contract . . . As to the difference of amounts, we consider such matters to be settled in a suit if not in a friendly way."

We cannot conceive, under these facts, how the payment of $1,000 each month by the railway company and its receipt by the power company, under the conditions indicated in the payment and receipt, could operate as an accord and satisfaction. There was no dispute between the parties but that, under any construction of the contract, $1,000 was due each month. That sum was liquidated, and became a stated account in any event, whether the method adopted by the power company or the method adopted by the railway company was the correct method for determining the correct amount to be paid each month. It was not, therefore, the payment of a smaller amount as full payment for a larger amount. Neither could it be construed as the determination of the railway company, beginning with the May payment, that even according to its interpretation of the contract it was all that was due. It conceded that much due in any event, and accordingly paid it, and in all its letters indicated its willingness to pay "whatever moneys are justly due and owing," and expressed its willingness "to take up and settle under the method provided by the contract," and was "anxious to have a determination of the meaning of such contract settled so that both parties would know exactly what rightful charges could be made," either in "a friendly adjustment" that would "settle once for all," or await the outcome of

the trial of the present case, and in such a forum, "settle absolutely the rights of the parties." Since, then, it was conceded by the railway company that there was no dispute as to $1,000 being due each month, and that this amount was dependent upon no condition or contingency ever in dispute between the parties, how can the doing of that which, by every conception of the contract, it was bound to do, operate as a discharge from doing something further, which was the only dispute between them? In paying this monthly amount, the railway company paid nothing further than its confessed obligation, which was not by way of compromise of its disputed obligation; leaving, as clearly indicated in its letters, notwithstanding its notation of full payment, an assumption that something more might be due, which it was ready to determine in a friendly adjustment, or await the decision of the court·upon the disputed claims.

Neither could it be an accord and satisfaction, because the power company had an absolute right to receive this sum each month from the railway company. It may or may not have been entitled to more, but its absolute right to this sum was disputed by no one. Appellant's letter of November 28, 1906, is a clear recognition of this situation, when it says, "it has been decided by the company to stand by the offer made by me of paying the amount designated in our contract as the minimum amount, namely $1,000 per month." An offer to pay the confessed minimum amount due can hardly be construed into a payment of the maximum amount due, nor as a payment in settlement of the whole controversy. While it may be difficult to lay down an exact rule that will fit all contentions of accord and satisfaction, it will not be disputed that running through all the cases is the principle that the sum received and accepted by the creditor must be less than the sum he considers himself entitled to receive; and that it must not only be shown that the debtor gave the amount in full satisfaction, but that the creditor received it as such. *Perin v. Cathcart*, 115 Iowa 553, 89 N. W. 12. The

case before us is devoid of all these essentials. It was the payment of a confessed and undisputed account stated. It was not intended nor received as a liquidation or settlement of the dispute. There was no agreement, nor anything that could be implied as an agreement on the part of the power company, in accepting what was its liquidated account. Neither was the payment of the liquidated account a tender upon the unliquidated account, for it required the whole amount to satisfy the liquidated debt, and there was nothing left to operate as a consideration for any accord and satisfaction of the unliquidated debt. It may be safely asserted that, underlying all application of the rule of accord and satisfaction, in cases of both liquidated and unliquidated accounts, where the creditor is absolutely and in any event entitled to receive a definite and fixed sum, but claims an additional sum to be his due, which additional sum only is disputed by the debtor, the payment by the debtor of the definite and fixed debt and its acceptance by the creditor, though tendered as payment in full, will not constitute an accord and satisfaction. *Duluth Chamber of Commerce v. Knowlton*, 42 Minn. 229, 44 N. W. 2; *Walston v. Calkins Co.*, 119 Iowa 150, 93 N. W. 49; *Weidner v. Standard Life & Accident Ins. Co.*, 130 Wis. 10, 110 N. W. 246; *Demeules v. Jewel Tea Co.*, 103 Minn. 150, 114 N. W. 733, 123 Am. St. 315, 14 L. R. A. (N. S.) 954; *Chrystal v. Gerlach* (S. D.), 125 N. W. 633; *Mintzer v. Supreme Council*, 41 Misc. 512, 85 N. Y. Supp. 23; *Howe v. Robinson*, 13 Misc. 256, 34 N. Y. Supp. 85; *Cochenour v. Rieser*, 58 Misc. 521, 109 N. Y. Supp. 807; *Louisville N. A. & C. R. Co. v. Bruce*, 109 Ky. 388, 59 S. W. 323; *Robinson v. Leatherbee Tie & Lumber Co.*, 120 Ga. 901, 48 S. E. 380; *Durchman v. Dunn*, 101 Fed. 606; *Martin v. White*, 40 Ill. App. 281.

Appellant strongly relies upon *Fuller v. Kemp*, 138 N. Y. 231, 33 N. E. 1034, 20 L. R. A. 785, and quotes it as a leading case. It will be noted that the claim there was unliquidated, being a bill for $670 for physician's services, which

the debtor conceived to be too large, and sent his check for $400 in full satisfaction, requesting the physician to either accept it upon the condition named or return it by first mail. To this letter the physician made no reply, but kept the check, and after the expiration of a year, brought his action to recover the balance. The case is, therefore, not in point upon the facts where, as here, we have the check sent in an amount liquidated as due in any event; and the court makes the distinction, saying, where the demand is liquidated, a different rule should be applied, and that in such case the acceptance of the less sum would not discharge the debt even if a receipt had been given, for the reason that the element of a consideration was lacking and the obligation of the debtor to pay the larger sum not satisfied. So that the case, in so far as it touches a case of liquidated account, is authoritative for the rule we are here asserting. That such is the rule in New York cannot be doubted. In addition to the New York cases cited, *supra*, see: *Laroe v. Sugar Loaf Dairy Co.*, 180 N. Y. 367, 73 N. E. 61, and *Harby v. Henes*, 45 Misc. 366, 90 N. Y. Supp. 461.

Coming now to the facts, it is contended that the method employed by the power company and adopted by the court below in computing the amount due was not in accordance with the contract; and that the evidence shows the power to have been supplied at a less voltage and at a greater loss than fixed by the contract. The contract provided two methods of computing the amount due for power; one at the rate of one cent per kilowatt hour, meter measurement, the other at the rate of three dollars per horse power, obtained by multiplying the average of maximum consumption of horse power by the railway company during two fifteen-minute intervals in each month, when the railway's consumption was greatest; the amount to be paid in any month by the kilowatt-hour method not to be less than the amount determined by the horse power method. It was further provided that commercially accurate integrating wattmeters of the

power company should be used in recording the kilowatt hours, and that a Bristol recording wattmeter should be used in computing the amount upon the horse power basis. The power company used the Bristol recording wattmeter, and computed the amount due under the horse power method; the difference between these two methods being that the integrating wattmeter automatically integrates and registers the past sum total of consumption, while the Bristol wattmeter does not integrate, and the integration must be determined by the eye or by use of a planimeter. The figures used by the court below in determining the amounts to be charged each month were obtained by using the planimeter. This being the method agreed upon by the contract, appellant cannot now be heard to say it was not a proper method.

The voltage required by the contract was not less than 580. Upon a few occasions, allowing for a two per cent loss in transmission permitted by the contract, it dropped below that requirement. In some instances the voltage was above the contract requirement during the fifteen-minute periods, which were to be used as a basis for ascertaining the amount of power furnished. We can see no breach of the contract in this regard, especially as there is no claim nor contention that the railway company was ever damaged by lack of power, or received less than it required. Objection is also made to the accuracy of the Bristol recording wattmeter. It is conceded by all the witnesses that any meter will sometimes run fast, sometimes slow; and that, if it is corrected occasionally, it will average up. The railway company was permitted under the contract to test the meters for accuracy. It does not appear that it ever did so. If it was dissatisfied with the meter, it should have taken advantage of this provision of the contract. Not having done so, but little credit should now be given to its claim of inaccuracy. Other claims of breaches of the contract are made, but we do not find them substantiated by the record. For instance, the claim is made that, during some of the months of the contract, the bills ren-

dered were in a greater sum than the power company now claims due. This seems to be accounted for in the difference between the eye reading and the use of the planimeter. But inasmuch as the power company only seeks to now recover the planimeter readings, we see no injury to the railway company because the bill rendered is larger than the submitted proof. Complaint is also made of the court's findings, because in a few instances the bill rendered was less than the amount found due. In each of these instances we have found the amount awarded by the court to be the amount substantiated by the testimony. The difference is probably accounted for by the difference in the eye reading at the time of rendering the bill and when accurate computation was made by the planimeter for use at the trial. Nine instances are cited where the court, as contended for by appellant, has allowed for certain months, not the amount of each month's bill, but rather the exact amount of the following month's bill. We have, however, carefully checked up the court's award with the evidence, and find in each of these instances the testimony supports the finding.

The findings of the court being amply sustained by the record, they will not be disturbed. We believe from a reading of the record they are both justified and accurate, and the judgment based thereon is affirmed.

CHADWICK, CROW, MOUNT, and ELLIS, JJ., concur.