[No. 25562.   Department Two.   August 5, 1935.]

RUTH GRAHAM, *Respondent,* v. NEW YORK LIFE
INSURANCE COMPANY, *Appellant.*[1]

¹Reported in 47 P. (2d) 1029.

*Wright, Jones & Bronson,* for appellant.

*Bell, McNeil & Bowles* and *Hamlet P. Dodd,* for respondent.

STEINERT, J.—This is an action to recover upon a life insurance policy. Trial before the court, sitting with a jury, resulted in a verdict for plaintiff. From a judgment on the verdict, defendant has appealed.

September 26, 1922, the appellant insurance company issued to Joseph W. Graham a policy of insurance upon his life in the face amount of one thousand dollars, payable at his death to his wife, the respondent herein. The contract of insurance contained a clause which provided for payment of double the face of the policy upon due proof that death of the insured had resulted directly, and independently of all other causes, from bodily injury effected solely through external, violent and accidental cause, and that such death had occurred within sixty days after sustaining such injury. The double indemnity clause further provided, however, that such benefit should not apply if the insured's death resulted from self-destruction, whether sane or insane, or from physical or mental infirmity, or directly or indirectly from illness or disease of any kind.

On March 25, 1933, while the policy was in full force and effect, the insured met his death as the result either of falling or else of leaping from the sixteenth

floor of the Medical & Dental Building in Seattle onto the roof of the two-story portion of that building. The respondent claimed that the death resulted from falling and was accidental, under the terms of the policy, thus entitling her to the double indemnity. The appellant claimed that the death was self-inflicted by jumping or leaping from the fire escape on the sixteenth floor, and that, therefore, only the face amount of the policy was due.

In June, 1933, the appellant, through its agent, delivered to respondent its check for the face amount plus interest and accrued dividends. Respondent refused to accept the check because of a notation thereon that it was in full settlement of all claims under the policy. The agent then, at respondent's direction, conferred with respondent's attorney with reference to the effect of the check upon the right of the respondent to sue upon the double indemnity provision. The attorney finally accepted the check and surrendered the policy to the agent, but only after the agent had signed and given to the attorney a receipt which recited that respondent had received nothing in settlement of the double indemnity provision, and that respondent did not waive any claim or right that she might have under that clause. The check was subsequently cashed by the respondent. Thereafter, the respondent began this action to recover the sum of one thousand dollars which represented the amount of the double indemnity over and above the face of the policy.

Upon its appeal, appellant assigns a number of errors. We think, however, that its various contentions fall under one or another of three general heads.

The first contention of appellant that we shall notice is that there is no evidence or reasonable inference from evidence to justify the verdict, that the verdict is against the weight of the evidence, and that substan-

tial justice has not been done. This contention under-
lies appellant's motion to dismiss, motion for directed
verdict, motion for judgment notwithstanding the ver-
dict, motion for new trial, and its assignment of error
on the entry of judgment for respondent.

There is very little, if any, dispute as to the evi-
dence. The disagreement is rather over the conclu-
sions to be drawn therefrom. Mr. Graham was fifty-
nine years of age at the time of his death. He was a
teacher by profession and for years just prior to his
demise had been a principal in one of the public schools
in Seattle, at a salary of about thirty-three hundred
dollars a year. He was married and had two grown
children, both of whom were university graduates and
were self-supporting. He owned his home, free and
clear of encumbrance, and had no debts. His home
life appears to have been ideal in every respect. He
was an active church member, was given to philosophi-
cal and religious discussion concerning the future life,
and held scruples against suicide.

During the two years prior to his death, Mr. Graham
suffered attacks of indigestion, constipation and dizzi-
ness. His eyes and ears had also given him some
trouble. All, or most, of his symptoms indicated a
toxic condition of his system. The combined effect of
his various ailments caused him to worry about him-
self at times, and it seems that he even harbored the
suspicion that he might have cancer.

He had consulted several physicians during the two-
year period, and in February, 1933, a specialist had
tentatively diagnosed the case as Meniere's disease, a
disease of the ear attendant with some of the symp-
toms already stated. His general physician then sent
him to a hospital, where X-rays were taken. The pic-
tures disclosed a diseased appendix and an adhesion
causing constipation. The patient was assured, how-

ever, that he did not have cancer, and this assurance gave him considerable mental relief. An operation for appendicitis and adhesions was advised, and on February 23, 1933, such operation was performed. Mr. Graham returned home from the hospital on March 4th and from that time on was making a normal and satisfactory recovery, and there was no further dizziness.

On the day of his death, March 25, 1933, Mr. Graham left his home at about eight-thirty o'clock in the morning to go down town to see his doctor and also to have his eyes tested for a change of glasses. He was still weak from his operation but was steadily improving. Because of his weakened condition, however, he decided not to drive his automobile, but took a street car instead. After reaching the business district of the city, he phoned to Mrs. Graham, as she had requested him to do.

It appears that Mr. Graham, after telephoning to his wife, immediately went to the Medical & Dental Building, where he entered an elevator and rode to the sixteenth floor. Whether he had an engagement there, is not shown. The elevator operator, who, so far as is known, was the last person to see him alive, testified that Mr. Graham was very nervous while in the elevator, paced back and forth, telling her repeatedly that he wanted to get out at the sixteenth floor, and actually attempted to get out at every stop that the elevator made. In explanation of this apparent nervousness, there was positive testimony to the effect that Mr. Graham had an aversion to riding in elevators because he felt hemmed in, and that after riding in one he would always seek fresh air.

After Mr. Graham had left the elevator at the sixteenth floor, the operator proceeded to the floor above and then back down to the ground floor without any intermediate stop. As she passed the third floor level,

she heard a heavy thud on the adjoining roof. She recognized the peculiar sound because there had been several suicides at the same place within the preceding few months. The maintenance manager of the building also heard the body strike the roof, and he, too, recognized the sound. He at once instructed his clerk to call the coroner, while he himself proceeded to the portion of the roof where the body lay. No one appears to have seen the body in its fall or flight. The coroner, on arrival, examined the body and found that death was the result of its striking the roof. Later, Mr. Graham's cane was found on the sixteenth-floor landing of the fire escape.

The coroner found in one of Mr. Graham's coat pockets a number of papers, including an envelope on which was partly printed, and partly written, the following inscription: "What's a poor body without a mind. My ears are ringing me to my doom." Appellant contends that this note indicated an intention to commit suicide. Respondent testified that the coat which Mr. Graham wore on that day was one that he had not worn for several weeks before. She also testified that Mr. Graham had read this particular inscription to her several months before, as an illustration of some poor fellow who needed medical treatment rather than punishment. The evidence shows that Mr. Graham was a collector of striking epigrams and quotations, taking them from magazines, newspapers and other sources and making use of some of them in his school work. There was no evidence that the particular lines had been recently composed by Mr. Graham, nor was any lead pencil found upon his person at the time of his death.

There was considerable evidence concerning the construction of the fire escape, both as to its platforms and as to the stairways between them. Measurements

and dimensions in detail were given by several witnesses. It was the contention of appellant that the construction of the apparatus rendered it impossible for one to fall out of it unintentionally and accidentally; it was also appellant's contention that the position of the body, considered in connection with the immutability of physical laws, established conclusively that Mr. Graham had climbed up onto the railing and deliberately jumped outward into space. On the other hand, it was the contention of respondent, based upon the same physical facts, that Mr. Graham in some way stumbled and fell from the stairway of the fire escape over the railing, and that the body was deflected somewhat from the direction in which it started by some interference, such as striking or grasping at the railing as the body passed over it.

The jurors viewed the premises and heard the evidence and, in the light of what they saw and heard, were able to form their own opinions as to how the accident probably occurred. It appears that, subsequent to the accident, the fire escape was screened in to prevent similar occurrences in the future.

In support of its argument that death must have resulted from suicide, appellant stresses the following facts presented by the evidence: (1) Previous disease as constituting a motive; (2) the extreme nervousness displayed by the deceased while in the elevator; (3) the note found in Mr. Graham's pocket; and (4) the location of the body. No one, or all, of these facts or circumstances proves conclusively that death was the result of suicide. Each of these factors was subject to different constructions, according to the way in which the evidence concerning it was considered by the jury. It must be remembered that the burden was not upon respondent to negative suicide; the burden was upon appellant to establish it. Respondent having

shown that death was caused by external and violent means, there was a presumption that it was accidental, and such presumption remained in the case until overcome by evidence to the contrary.

"It is now settled law in this state that, the presumption against suicide having once attached, it remains in the case until overcome by evidence to the contrary, and that the burden of overcoming the presumption is upon the insurance company. . . . (1) The burden is upon the plaintiff to show by a preponderance of the evidence that death was caused by external, violent and accidental means; (2) that upon a showing of death by external and violent means, the law raises the presumption that death was accidental, and upon such showing, aided by the presumption, a *prima facie* case for plaintiff is made; (3) that the presumption remains in the case until it is overcome by evidence to the contrary; and (4) that suicide is an affirmative defense, and must be established by the defendant by a preponderance of the evidence." *Selover v. Aetna Life Ins. Co.*, 180 Wash. 236, 38 P. (2d) 1059.

The evidence was, in our opinion, clearly sufficient to support the verdict that the death was accidental.

The next contention of appellant is that the testimony established a complete accord and satisfaction, by delivery and acceptance of the check in full settlement of all claims under the policy, and for that reason, therefore, the complaint should have been dismissed and judgment rendered for appellant notwithstanding the verdict. We have had frequent occasion to discuss the doctrine of accord and satisfaction, and there are a number of principles and rules applicable thereto that are well settled. For guidance upon the question under consideration, we may first state some of these principles and rules: (1) Whether there has been an accord and satisfaction in any given case is generally a mixed question of law and fact. *First*

*National Bank v. White-Dulaney Co.,* 123 Wash. 220, 212 Pac. 262; *Kubey v. Coast Athletic Club,* 172 Wash. 305, 20 P. (2d) 21.

(2) But where the facts are not in controversy, it is purely a question of law for the court. *Bottorff v. Page Machinery Co.,* 174 Wash. 438, 24 P. (2d) 1059.

(3) To create an accord and satisfaction in law, there must be a meeting of minds of the parties upon the subject and an intention on the part of both to make such an agreement. *Ingram v. Sauset,* 121 Wash. 444, 209 Pac. 699, 34 A. L. R. 1031; *Kubey v. Coast Athletic Club,* 172 Wash. 305, 20 P. (2d) 21.

(4) An accord and satisfaction is founded on contract, and a consideration therefor is as necessary as for any other contract. *Plymouth Rubber Co. v. West Coast Rubber Co.,* 131 Wash. 662, 231 Pac. 25; *Katich v. Evich,* 161 Wash. 581, 297 Pac. 762; *Seattle Investors Syndicate v. West Dependable Stores,* 177 Wash. 125, 30 P. (2d) 956.

(5) Where the debtor pays what in law he is bound to pay and what he admits that he owes, such payment by the debtor and its acceptance by the creditor, even though tendered as payment in full of a larger indebtedness, do not operate as an accord and satisfaction of the entire indebtedness, because there is no consideration therefor. *Seattle, Renton, etc. R. Co. v. Seattle-Tacoma Power Co.,* 63 Wash. 639, 116 Pac. 289; *Plymouth Rubber Co. v. West Coast Rubber Co.,* 131 Wash. 662, 231 Pac. 25; *Anderson v. Sanitary Dairy,* 160 Wash. 647, 295 Pac. 925; *Seattle Investors Syndicate v. West Dependable Stores,* 177 Wash. 125, 30 P. (2d) 956.

(6) Generally speaking, when a debtor sends to his creditor a check in an amount that the debtor is willing to pay, and at the same time informs the creditor that the debtor intends the check to be considered as full

payment, then, by accepting and cashing the check, the creditor agrees to the settlement and cannot thereafter seek additional compensation. *LeDoux v. Seattle etc. Shipbuilding Co.,* 114 Wash. 632, 195 Pac. 1006; *James v. Riverside Lbr. Co.,* 121 Wash. 130, 208 Pac. 260; *Ingram v. Sauset,* 121 Wash. 444, 209 Pac. 699, 34 A. L. R. 1031; *Three Rivers Growers' Ass'n v. Pacific Fruit & Produce Co.,* 159 Wash. 572, 294 Pac. 233; *Katich v. Evich,* 161 Wash. 581, 297 Pac. 762; *Bottorff v. Page Machinery Co.,* 174 Wash. 438, 24 P. (2d) 1059.

(7) But the rule just stated does not apply where there is an agreement that a certain sum shall be paid on account and not in full settlement, and the sending of a check stating that it is in full settlement does not, as a matter of law, under such circumstances, effect an accord and satisfaction. *LeDoux v. Seattle etc. Shipbuilding Co.,* 114 Wash. 632, 195 Pac. 1006.

(8) Nor does that rule apply where the debt or amount is liquidated or certain and due, unless there is a new consideration. *First National Bank v. White-Dulaney Co.,* 123 Wash. 220, 212 Pac. 262.

(9) Where the amount of a debt or obligation is unliquidated or in dispute, then the tender by the debtor of a certain sum in full payment of the debt, followed by acceptance and retention of the amount tendered, establishes an accord and satisfaction; but if the amount be liquidated or undisputed, then such tender and acceptance do not establish an accord and satisfaction. *Northern Bank & Trust Co. v. Harmon,* 126 Wash. 25, 217 Pac. 8; *Plymouth Rubber Co. v. West Coast Rubber Co.,* 131 Wash. 662, 231 Pac. 25.

Applying these rules to the case before us, we conclude, as a matter of law, that there was no accord and satisfaction. In the first place, all of the evidence on the subject came from respondent's witnesses and

there was no conflict thereon. Hence, it presented purely a question of law, under rule (2) above. It must be apparent, also, from the evidence that we have recited, that there was no meeting of minds or agreement that the check satisfied the liability under the double indemnity clause. The receipt exacted by respondent negatives any such agreement on her part. Rule (3), therefore, applies. It needs no argument to prove that there was no consideration moving from the appellant for an agreement to release it from the double indemnity clause. Rule (4) is, therefore, applicable. The appellant, by its check, paid only that which it was in any event bound to pay and that which it admitted to be due and owing. The case, therefore, falls under rule (5). Rule (6) might apply to the case and suggest an accord and satisfaction were it not for certain facts that bring it within the exceptions stated in rules (7), (8) and (9). The delivery and acceptance of the check were accompanied by an agreement that the check was not to be in full settlement.

But the controlling factor of the case is that there was no dispute as to the amount that appellant was required to pay under either feature of the policy. As to each feature, it was all or nothing. As to the face amount of the policy, there was no dispute of any kind whatever. As to the double indemnity, the only dispute was whether any liability at all attached thereunder. If death was accidental and not suicide, then the appellant would be obligated to pay the double amount. On the other hand, if death was the result of suicide, then the company would be obligated to pay only the face amount of the policy. The amount being certain and undisputed as to either alternative, the claim must be classed as the equivalent of a liquidated claim. No new or additional consideration having been

given for tendering less than the amount due for the greater liability, there was no accord and satisfaction.

■ Appellant next contends that the court erred in refusing to instruct the jury on the question of the authority of the agent to sign the receipt, the effect of which was to alter the provision in the check that it was in full settlement of all claims under the policy. The evidence with reference to this phase of the case all came from respondent's witnesses and was undisputed. It was clearly established by the evidence that the particular individual was the agent of the appellant, that he had conducted all of the matters with reference to the particular policy, and that he had been instructed to deliver the check and take up the policy. What he did in connection with giving the receipt was within the apparent scope of his authority. Respondent fully made out a *prima facie* case in that respect, and the burden was on appellant to meet it with countervailing evidence. But appellant did not meet that burden. It offered no evidence whatever on the subject of the agent's authority or lack of authority. There was no issue of fact as to the agent's authority for the jury to decide. Hence, there was no occasion for any instruction thereon.

■ Appellant finally contends that the court erred in refusing personally to inspect the fire escape and premises, prior to passing on the motion for new trial. The jury had, during the progress of the trial, upon stipulation of the parties, viewed the premises, but the judge had not accompanied the jury on its visit. When appellant filed its motion for new trial, it accompanied it with a request that the court inspect the premises before passing on the motion. Respondent objected to the request. The court declined to consider a view, upon the theory that, as a matter of law, it had no right to do so in the absence of the consent of both

counsel. Appellant assigns the ruling as reversible error.

Even though the court may have had the right to view the premises, it was not mandatory upon it to do so. Such matters rest entirely in the sound discretion of the court, to be reviewed only for manifest abuse of discretion. There was no conflict in the evidence regarding the location and construction of the fire escape. It was fully described in the testimony and in the photographs and diagram which appear in the record. There was nothing about the situation that was not intelligible. Inspection of the premises, particularly after they had been altered by putting up a screening, would have given the court no information that it could not have readily visualized from the evidence. Under such circumstances, we conclude that appellant was not prejudiced by the failure of the court to view the premises. It therefore becomes unnecessary to determine whether the court had the inherent right, as a matter of law, to avail itself of such view.

The judgment is affirmed.

MITCHELL, HOLCOMB, MAIN, and BLAKE, JJ., concur.