[No. 29638.  Department One.  November 29, 1945.]

LADY WILLIE FORBUS, *Appellant,* v. ALBERT S. KNIGHT, *as Executor, et al., Respondents.*[1]

[1]Reported in 163 P. (2d) 822.

*John L. McGar* and *Florence Mayne,* for appellant.

*Wright & Wright,* for respondent.

STEINERT, J.—Plaintiff brought suit against the defendants to recover damages and to enjoin the continuance of an alleged nuisance threatening further damage to her real property. As grounds for the action, the complaint as subsequently amended alleged that the roots of a certain tree situated on land owned by the defendants invaded plaintiff's property and periodically clogged her sewer pipe line, causing sewage to back up into the basement of her house; and that such results would recur intermittently unless the nuisance was abated. Trial before the court without a jury resulted in a judgment dismissing the action with prejudice. Plaintiff appealed.

For some time prior to, and ever since, 1924, appellant, Lady Willie Forbus, has been the owner of lot six, block twenty, Carleton Park Addition to the city of Seattle. This lot, having a width of fifty feet, fronts on Magnolia boulevard and extends back, eastwardly, a distance of approximately one hundred thirty feet to Constance drive. In that vicinity, Magnolia boulevard has a considerable parkway space, which borders the front of appellant's property.

In 1924, appellant improved her lot by constructing thereon a residence building which she has ever since occupied as her home. The house, numbered 2580 Magnolia boulevard, is situated approximately in the middle of the lot but faces south, instead of west toward Magnolia boulevard. The front of the house is ten or twelve feet from the south boundary line of the lot. The area immediately surround-

ing the house, including the portion between the house and appellant's south property line, was at about that same time filled with earth to a height of three feet above the natural surface of the ground. After the house had been constructed, appellant with the aid of a horticulturist planted considerable shrubbery on and about her premises, and she now has, in all, fifty to seventy-five specimens of various deciduous, evergreen, and other types of, trees and shrubs. Further reference to appellant's shrubbery and its locations will be made later.

In 1928, appellant installed a lateral sewer leading from her house in a southerly direction to a point a foot or two from her south boundary line and there turning and extending eastwardly, parallel with that line, until the lateral pipe reached Constance drive, where it connected with the city trunk sewer. The lateral sewer, constructed of the ordinary sewer tile having thirty-inch sections, was laid about nine and one-half feet below the improved surface of appellant's lot and in its descent from the house had a fall of about two per cent.

Respondent Albert S. Knight, to whom we shall hereinafter refer as though he were the sole respondent in this case, has for approximately the same period of time mentioned above owned lot five and a part of lot four, in block twenty of the same city addition. His property has a width of eighty-seven and one-half feet; and it is immediately south of, and three feet lower than, appellant's property.

Upon respondent's property is a residence, numbered 2570 Magnolia boulevard, which he built in 1928 and ever since has occupied as his home. Respondent also constructed a lateral sewer, extending along and within about five feet of his south boundary line. This sewer connects with respondent's house at two points, one on the east side and the other on the south side thereof.

Upon respondent's premises is also a considerable number of trees and shrubs, planted there by the same horticulturist who landscaped appellant's premises. In this action, however, we are concerned primarily with only one tree, designated as a salix babylonica, commonly known as a weeping

willow. To distinguish it from the other trees and shrubs hereinafter mentioned, we shall at times refer to it simply as the "babylonica." That tree, which is about thirty feet tall and has a diameter of six to eight inches along its trunk, stands east of respondent's house and is situated about twenty-five feet from the boundary line common to the two properties, or approximately twenty-six and one-half feet from the line of appellant's lateral sewer, measured along the surface of the ground. Another tree, of which some complaint was for the first time injected by the appellant during the course of the trial, is described as an evergreen cedrus type of tree. That tree stands upon respondent's property, east of the babylonica, and is situated about six feet from the common boundary line. We shall hereinafter refer to that tree simply as "respondent's cedrus tree."

In November, 1938, appellant's lateral sewer became clogged, flooding her basement with water and waste matter. A sewer worker, summoned by the appellant, cleaned out the sewer line by inserting into it, at the sump in appellant's basement, a rotary cable to which were attached cutting knives operated with electricity. In this manner a large quantity of roots was extracted from the inside of the sewer line. The expense incurred by appellant for that service amounted to $12.50. About that same time, appellant submitted specimens of the extracted roots to the forestry department of the University of Washington, with the view of identifying their species.

In December, 1939, appellant's lateral sewer again became clogged, flooding her basement with water and waste matter. On that occasion she incurred an expense of $9.75 for cleaning out the sewer line by the method above described. She again submitted specimens of the extracted roots to the forestry department of the university.

In December, 1940, a similar occurrence took place and the expense then incurred by appellant amounted to $7.50. Specimens of the roots were again submitted to the forestry department. By that time, appellant had become convinced that the trouble was caused by roots from respondent's babylonica tree invading her premises and attacking her

sewer in their search for water. She thereupon made complaint to respondent and his wife, Hulda O. Knight, who has since died, and exhibited to them samples of the roots which had been extracted from the sewer line. At the instance of Mrs. Knight, who was ill at the time, respondent paid appellant $7.50, the amount of expense incurred on the last occasion. According to respondent's testimony, that payment was made, not in recognition of any liability on his part, but "to keep peace in the neighborhood."

In consequence of appellant's complaint regarding the babylonica tree, respondent consulted the horticulturist who had set out the shrubbery on both properties, and was advised by him to dig a trench about the north side of the babylonica and install therein a metal sheathing to cut off the roots if they were getting into appellant's property.

Respondent thereupon dug a trench, of a horseshoe shape, to a depth of four feet and for a length of about forty-eight feet, around the north side of the babylonica and about twelve feet away from its base. He left the trench open for about six weeks and during that time cut off all roots that were exposed therein. At the same time, he procured six strips of sheet metal, each being eight feet long and forty-two inches wide, and riveted them together lengthwise. He then set the forty-eight foot metal sheath, on edge, lengthwise in the trench in such position that its upper edge stood six inches below the surface of the ground, and its lower edge extended about six inches into hardpan. The trench was then filled with earth.

In November, 1941, however, appellant had the same experience as before with reference to the clogging of her sewer line. Again it was cleaned out, at an expense to her of $7.73. Samples of the extracted roots were similarly submitted to the forestry department.

In August, 1942, appellant commenced this action, seeking damages in the sum of $29.98 for the total amount paid by her, less the $7.50 credit, for cleaning out the lateral sewer during the years from 1939 to 1941, both inclusive, and two hundred dollars for the impairment and necessary reconstruction of her sewer line; also seeking an injunction re-

quiring abatement of the alleged nuisance. An amended complaint, prepared in May, 1943, and filed April 8, 1944, set up the same cause of action and sought exactly the same recovery and relief.

On motion of the respondent during the progress of the settlement of the pleadings, the court ordered that the item of $12.50 for expense incurred in 1938 be stricken from the complaint, on the ground that the statute of limitations had run against it.

The cause came on for trial on April 18, *1944*. In the meantime, in October, 1942, which was after the commencement of the suit, appellant's sewer again became clogged, necessitating the same process of cleaning as before, at an expense of $7.73. Similar occurrences took place in April, 1943; August, 1943; and, finally, on or about April 9, 1944, which was just before the trial began. On each of these occasions appellant incurred an expense of $7.73 for clearing out the sewer, and each time she submitted specimens of the extracted roots to the forestry department.

During the interim between April 13 and April 15, 1944, just before the commencement of the trial, appellant employed sewer workers who made an excavation three feet wide, ten feet long, and nine and one-half feet deep, to the bottom of the lateral sewer line, at a point directly north of, and twenty-six and one-half feet distant from, the babylonica on respondent's premises. The excavation uncovered three sections of the sewer pipe and their joints. The results of that excavation and the inspections which followed it constitute a large part of the evidence submitted upon the trial.

On the morning of the trial, appellant presented to the court her petition for leave to make certain trial amendments to her complaint by adding thereto the additional expense incurred by her in 1942, 1943, and 1944 for cleaning out the sewer; the expense of excavation, amounting to fifty dollars; the expense of services of experts to determine the cause of the stoppage, amounting to fifty dollars; the cost of installing an entire new sewer line, estimated at $351; and also allegations to the effect that respondent's cedrus tree,

located six feet from her property line, was threatening to invade her sewer and therefore constituted a nuisance, for which she asked abatement.

On objection interposed by the respondent, the court at first reserved its ruling on the trial amendments but later refused to permit them, although it did subsequently allow proof of the additional expenses incurred by appellant for cleaning out the sewer on the four occasions transpiring after the commencement of the action.

At the conclusion of appellant's case in chief, she requested the court to view and examine the premises here involved, to which the respondent objected. The court stated that it saw no necessity for visiting the scene and preferred to depend on the testimony of the witnesses, but that if, in the further progress of the trial, necessity required an examination by the court, it would be made. At no time, however, did the court view the premises, although further request therefor was made by the appellant.

After all the evidence was in, the court took the matter under advisement and, some time later, rendered a memorandum decision, which appears as a part of the statement of facts herein. In that memorandum, the court stated, among other things, that appellant had at various times extracted, from her sewer, roots "from many varieties of trees and shrubs as well as weeping willow roots," and that the court was unable to find from the evidence whether or not the weeping willow roots extracted by the appellant were from the babylonica on respondent's property. The court further expressed a doubt as to where the willow roots came from,

". . . because of the fact that there is a *weeping willow tree* about fifteen feet tall, with a diameter at the base of from two and one-half to three inches, on plaintiff's [appellant's] property, and which tree is in closer proximity to that part of the sewer which becomes clogged than the tree [babylonica] on defendants' [respondents'] property." (Italics ours.)

The court concluded its memorandum decision by saying:

"Owing to the fact that many varieties of roots cause the

clogging of the sewer, and being unable to identify the willow roots found among the roots removed from said sewer when cleaned as being roots coming from the weeping willow tree on defendants' property, I shall have to hold that plaintiff cannot recover, and will direct judgment of dismissal in favor of the defendants."

Pursuant to its memorandum decision, the court made findings of fact and conclusions of law, reiterating the statements made in its memorandum decision, and, on the basis of such findings and conclusions, entered the judgment from which this appeal was taken. Because of its peculiar bearing upon the principal question here involved, we recite the body of the judgment:

"THE ABOVE ENTITLED MATTER having come on regularly for hearing before the undersigned, one of the Judges of the above entitled court, and findings of fact and conclusions of law having been made therein; Now, THEREFORE, *in pursuance of said findings and said conclusions.*

"IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the plaintiff [appellant] take nothing in this action and that the same be and is hereby dismissed with prejudice, the defendants [respondents] to severally recover their costs herein, they having appeared separately in this cause.

"DONE IN OPEN COURT this 22 day of June, 1944." (Italics ours.)

Appellant seasonably moved for a new trial, accompanying her motion with a group of affidavits pointing out the mistakes of fact made by the trial court in those portions of its memorandum decision referred to and quoted above and in its findings based thereon. Respondent filed a counter affidavit acknowledging the mistake made by the trial court in that part of its memorandum decision first above quoted, and pointing out that the evidence showed that the tree which stood on appellant's property in close proximity to the sewer was a "cypress tree" about twenty-eight feet tall, standing six feet from the sewer at the place where the excavation was made.

The trial court thereupon considered the matter further and later rendered a second memorandum decision, which is included in the transcript of the record on appeal, but not

in the statement of facts. In that memorandum the court also acknowledged its mistake in the first memorandum and explained that the tree to which the court actually had reference as being on appellant's property, within a few feet of the sewer, was one of the "genus cedrus," a water-loving tree "whose roots would go a great distance in order to find water." In the same memorandum the court stated that, because of the fact that respondent had installed a metal sheath about the babylonica, the court had a reasonable doubt as to whether the willow roots found in the sewer pipe actually came from that tree, but, assuming that they did, the court was of the expressed opinion that the fault lay entirely with the appellant, in that she failed to cement the joints of her lateral sewer and that such failure was the sole proximate cause of the willow roots entering the sewer pipe; further, that since the roots of the babylonica had been cut off on the north side, the new sproutings would not be able to *force* an entrance into the sewer, but could enter it only because of insufficient cementing of the sewer connections.

The court concluded its second memorandum decision by directing that its findings of fact and conclusions of law formerly entered be *vacated*. In accordance with its views latterly expressed, the court entered an order vacating the findings and conclusions but at the same time denying appellant's motion for a new trial. However, the judgment of dismissal previously entered and quoted above was allowed to stand, and it is the only judgment or decree rendered in this action.

We come now to a consideration of the evidence given at the trial. In so far as that evidence is expressed in the foregoing statement of the case, it is not in dispute and hence need not be repeated. We shall therefore endeavor to make only such additional statement of the evidence as will fairly present the opposing contentions made by the parties herein. Appellant herself testified, on direct, cross, redirect, and rebuttal examinations, in substance as follows:

Prior to 1938 she never had any trouble with her sewer. She has upon her premises in the vicinity of the sewer line many varieties of flowers and shrubs, such as rhododen-

drons, azaleas, jonquils, dahlias, and nasturtiums, all of them being shallow-rooted. Close by the front of her house, on either side of the porch, are two cypress trees about fifteen feet tall and having a diameter of about four inches at their bases; these trees were planted in 1925 and have attained their full growth. Both of them are shallow-rooted. One is situated about six feet from the sewer line at the point where the excavation was made; the other is about twelve feet from the same point. Next to those two trees are two fire-thorns and a juniper. On the east side of her house is a cypress type of tree which has a diameter of three and a half inches at its base and reaches a height equal to a third of the height of the second story of the house. Further east, toward Constance drive, are other small trees and shrubs. West of the house are two willow trees, to which frequent reference was made in the testimony. One is what is called an umbrella tree, which is about five feet high and has a diameter of three and a half inches at its base. It was planted in 1941, after the third sewer stoppage had occurred, and is situated about sixty-six feet from the sewer line where the sewer leaves the house and turns in the opposite direction. The other willow tree is situated in the parkway on Magnolia boulevard about seven feet beyond her west property line and one hundred sixteen feet from where the last stoppage in the sewer occurred. She planted that tree in 1938, and it is now about fifteen feet tall and has a diameter of six inches at its base. Considerable other shrubbery and flowers are planted in the front lawn.

After the excavation was made appellant went down into the trench and observed the various roots extending from the two side walls. At the bottom of the trench she found a mass of twisted roots which fastened themselves longitudinally along the pipe, and it was with difficulty that she was able to tear them off. On her side of the trench, however, sizable roots went down no further than three feet from the surface; beyond that, for a distance of three feet, no roots whatever appeared; then below that area appeared only small, fine tail ends of roots. She took samples of the various roots and earth clinging to them to the forestry de-

partment for identification. All the trees and shrubbery located on her premises are shallow-rooted and are well watered by her private sprinkling system.

Appellant's principal witness was Bror L. Grondal, professor of forest woods and forest technology in the University of Washington. He testified substantially as follows: He had taught his subject for thirty years and had done a considerable amount of consultant work with respect to such matters for various concerns. He made an examination of plaintiff's premises a few days before the trial. Going down into the trench he found that the sewer had attracted the roots of a willow tree and also found roots approaching from a "cedrus tree." In the bottom of the trench were roots which, by laboratory tests, he found to be babylonica roots; these were in immediate contact with the sewer pipe at the joints and required force to extract them. These roots all came from the south side of the wall, the side next to respondent's property. There were no roots coming from appellant's side lower down than three feet from the surface of the ground. All trees will seek water, but babylonicas are particularly water-loving in nature and their roots will travel more than fifty feet in search of moisture. The roots will not penetrate a galvanized iron barrier, but will go underneath it without any difficulty if the barrier is at no great depth. Willow roots will not travel through hardpan as readily as they will through sandy soil, but will penetrate quite hard soil, and in course of time will even penetrate hardpan. He took samples of the roots which he had extracted, submitted them to laboratory tests, took pictures of them magnified one hundred twenty times, and found them to be of the babylonica species. It was his opinion that the roots which entered appellant's sewer and caused the stoppage came from respondent's babylonica tree.

Two other witnesses for the appellant were sewer men who had cleaned out the pipe line in the period from 1939 to 1943. They described the method of cleaning and testified that on those occasions they had taken quantities of roots from appellant's sewer, but they could not identify the character of them. One of those witnesses also testified that

it would require a cast-iron pipe to resist an attack by roots, but that they will invade a concrete sewer at the joints.

Respondent had an equal number of witnesses. He himself testified substantially as follows: His second wife, Adelaide Knight, had no interest in the property. Appellant had planted her shrubbery before respondent moved into his house on the adjoining land. The north side of his house is about twenty-eight feet from appellant's lot line. Respondent's neighbor on the south also has a willow tree, larger and older than respondent's babylonica tree here in question. The neighbor's tree is about thirty feet from respondent's sewer line, but no trouble has ever been experienced therefrom, although the soil of the neighboring properties here involved is the same. He then explained how, in 1940, he had dug a ditch about the north side of the babylonica and set therein the metal sheath, as above described. Since then, he has intermittently dug down in the ditch to hardpan, but has found no roots going through the riveted joints of the metal barrier, or over the top of it, or underneath it. Much of appellant's vegetation and trees had been planted when respondent moved onto his own property; some of it has been planted since then. Appellant has a number of tall evergreen trees near her sewer line and other trees, including a large plum tree, on various parts of her lot.

He examined the trench which appellant had excavated a few days before and saw outcroppings of roots on all sides of the trench, all the way down. There were no more roots on the south side of the trench than there were on the north side. The roots which he saw in the trench varied in size from that of a hair to that of one's little finger. The babylonica on respondent's property was planted in 1929 or 1930, after appellant had planted her willow trees. The hardpan around the babylonica is about three feet below the surface of the ground. No roots went over the metal sheath.

Percy Burdett, the horticulturist who landscaped both properties, testified concerning the nature and locations of the various trees, shrubs, and flowers on both properties. He testified that all the trees on appellant's property had a tendency to go down to water and block sewers; that appellant

had two willow trees on or near her property which had the same tendency as the babylonica to travel to water; also two weeping birches that would hunt water. He testified that he had recommended to the respondent the installation of the metal sheath, but admitted that he had never had any experience with such a contrivance, nor had he had any experience with sewers being clogged by tree roots except, when digging shrubs, he had observed their habits in searching for water. Although he had not seen the particular excavation above referred to, he testified that the trees near appellant's front porch, situated six and twelve feet, respectively, from her sewer line, would send their roots down to hardpan and then in their search for water would travel along the top of the hardpan toward the pipe line where the hardpan had been broken to lay the pipe. He stated that roots would not penetrate hardpan and expressed his doubt concerning Professor Grondal's statement that they would.

C. B. Rising, who had been engaged in the plumbing and sewer business since 1921, testified that he had many times taken roots from sewers; that although tree roots would grow underneath a metal apron if there were loose soil beneath it, they would not do so if the apron went into solid hardpan; that if roots were cut off by such a metal sheath, that portion of them nearest the tree would grow shoots, but it would require fifteen years before they would proceed far enough to affect a sewer, and even then would have to be in earth which would permit them to grow; they would not grow through hardpan. It was his opinion that trees of the kind which appellant had near her front porch would send their roots into the sewer.

Ralph H. Wayland, who was respondent's neighbor on the south, testified that a weeping willow, eighteen to twenty-four inches in diameter, was on his property, distant about thirty feet from respondent's sewer, and that it had never caused him or the respondent any trouble.

In her brief, appellant has assigned fourteen errors, but these are grouped and discussed under four heads, and will be so considered here.

Under the first three assignments, the appellant contends that the court erred in refusing to permit the trial amendment. The amendment was offered for the first time on the day of the trial. As stated before, that portion of the offered amendment which related to the expenses incurred by the appellant for cleaning out the sewer since the commencement of the action was, in effect, allowed by the court when it permitted proof of those expenses. The remainder of the offer set up an additional element of damage (the estimated expense of constructing an entirely new sewer) and an entirely new cause of action (relating to respondent's cedrus tree).

The matter of trial amendments rests largely in the discretion of the trial judge, and his refusal to permit such amendment will not be overturned except for manifest abuse of discretion. *Worthington v. La Violette*, 60 Wash. 525, 111 Pac. 784; *Eaton v. General Compressed Air & Vacuum Machinery Co.*, 62 Wash. 373, 113 Pac. 1091; *Hedrick v. Washington Nat. Ins. Co.*, 186 Wash. 263, 57 P. (2d) 1038.

At the time the amendment was offered, the cause had been pending a year and eight months. The appellant had in the meantime already once amended her complaint. The respondent was not prepared to meet the new issue. The excavation recently made would in all likelihood have been closed before the case reached trial upon a continuance. We cannot find that the trial judge abused his discretion in refusing to permit the trial amendment. Moreover, in view of our disposition of the case, that question is no longer of much importance.

Appellant's next contention is that the court erred in refusing to view the premises. It must be conceded that if the court had visited the premises and observed the conditions, it might have obtained a clearer understanding of the situation and would no doubt have avoided the mistakes made in its original memorandum decision as incorporated in the findings of fact. However, the matter of visitation of premises by a trial judge rests entirely in the sound discretion of that judge. While he may have the *right* to view the premises involved, it is not mandatory upon him to do

so. *Graham v. New York Life Ins. Co.*, 182 Wash. 612, 47 P. (2d) 1029. In this instance, the trial court did not base its refusal on the ground that it did not have the power or right to visit the premises, but upon the ground that it preferred to confine itself to the testimony given by the witnesses in court. That was an exercise of discretion which this court will not disturb.

The principal contention made by the appellant is that, upon the evidence adduced, the trial court made erroneous findings of fact and conclusions of law, upon which it entered an erroneous judgment, and, thereafter, though vacating the findings and conclusions, nevertheless allowed the erroneous judgment to stand.

It will be remembered that the trial court originally based its judgment upon its first memorandum decision (which is properly included in the statement of facts) and upon its findings and conclusions. It will also be recalled that the court was mistaken in at least one of its statements of a material fact, as expressed in the memorandum decision and in the findings. It is to be further borne in mind that the judgment which was entered upon the findings and conclusions was never in any way altered or amended, specifically or otherwise, but was allowed to stand in its original form, after the findings and conclusions had been vacated. As will appear later, so far as this appeal is concerned, we are not permitted to consider the second memorandum decision.

■ The vacation of the findings and conclusions dissipated whatever efficacy they might otherwise have had as support for the judgment. Such vacation did not, however, expand the basis upon which the judgment, entered simultaneously with those findings and conclusions, was founded. As shown above, the judgment recited specifically:

"Now, THEREFORE, *in pursuance of said findings and said conclusions,* It Is HEREBY ORDERED, ADJUDGED AND DECREED," etc. (Italics ours.)

In other words, the judgment in this case was expressly rested upon the findings and conclusions as then made, even though those findings and conclusions, as such, were subse-

quently vacated, and the record, in so far as it properly may now be considered, in no way indicates that the factual basis of the judgment was by the court at any time broadened beyond the scope of the original findings. We have, then, a judgment which is founded expressly upon certain erroneous findings and conclusions, rested, in turn, upon a memorandum decision likewise erroneous in point of fact. The error contained in the first memorandum decision was thus projected through the findings into the judgment and, so far as the cognizable record shows, was never eradicated. The judgment has no stable foundation on which it can rest and, therefore, cannot be upheld.

■ We have hereinbefore frequently referred to the trial court's second memorandum decision and have in substance set forth its tenor and content. In her brief, appellant herself endeavored to bring the second memorandum decision to the attention of this court. Respondent's counsel have in their brief, however, themselves strenuously insisted that the second memorandum decision cannot be considered, because it does not appear in the statement of facts, but merely in the transcript. Respondent's point is well taken, for, under the rules and decisions of this court, a memorandum decision of the trial court must be included in the statement of facts and, unless it is, will not be considered on appeal, even though it appears in the transcript. Rule 9 (5), Rules of the Supreme Court, 193 Wash. 11-a, 18 Wn. (2d) 11-a; *Brooks v. Hutchinson,* 165 Wash. 327, 5 P. (2d) 495; *Johnsen v. Pheasant Pickling Co.,* 174 Wash. 236, 24 P. (2d) 628; *Mullin v. King County,* 19 Wn. (2d) 1, 140 P. (2d) 789.

If, however, the second memorandum decision were included in the statement of facts, the situation would not be improved, so far as the respondent is concerned. For in that decision the trial court, after expressing a doubt as to whether the willow roots examined by Professor Grondal actually came from respondent's babylonica tree, adopted a course of reasoning based upon the assumption that the roots of that tree did actually enter appellant's sewer. The court then decided the case against the appellant on the

theory that the roots entered and clogged the sewer because of appellant's negligence in failing to cement the joints of the pipe line in a proper manner, and that such negligence and failure were the sole proximate cause of the resultant damages.

█ It is not the law that the owner of premises is to be charged with negligence if he fails to take steps to make his property secure against invasion or injury by an adjoining landowner. It is the duty of the one who is the owner of the offending agency to restrain its encroachment upon the property of another, not the duty of the victim to defend or protect himself against such encroachment and its consequent injury. Respondent in his brief virtually concedes the correctness of this principle. However, since the matter of the second memorandum decision is not properly before us, we shall not discuss at further length the law involved therein, but will merely cite the following cases in support of the general principles underlying our statement of the law upon that subject: *Farnandis v. Great Northern R. Co.*, 41 Wash. 486, 84 Pac. 18, 111 Am. St. 1027; *Gostina v. Ryland*, 116 Wash. 228, 199 Pac. 298, 18 A. L. R. 650; *Stevens v. Moon*, 54 Cal. App. 737, 202 Pac. 961; *Shevlin v. Johnston*, 56 Cal. App. 563, 205 Pac. 1087; *Buckingham v. Elliott*, 62 Miss. 296, 52 Am. Rep. 188.

█ In bringing this opinion to its conclusion, we are not to be understood as expressing any view as to whether or not it was the roots of respondent's babylonica tree that caused the stoppages in appellant's sewer. That was the vital issue in the case, which the trial court did not finally determine. The determination of that issue depends upon the evidence, and the controlling weight of evidence depends largely upon the credibility of the witnesses who testify. We are not able, upon a typewritten record such as we have here, to determine the matter of credibility. That is a matter peculiarly within the province of the trial judge, who

sees and hears the witnesses. A proper determination of the questions involved in this case requires that it be retried.

The judgment is reversed, with direction that the court grant a new trial.

BEALS, C. J., MILLARD, SIMPSON, and MALLERY, JJ., concur.

January 18, 1946. Petition for rehearing denied.