[No. 28432. Department One. October 3, 1941.]

HELEN C. GOULD, *Appellant*, v. DEAN WITTER *et al.*, *Respondents.*[1]

[1]Reported in 117 P. (2d) 210.

Henderson, Carnahan & Thompson, for appellant.

C. E. Hughes, for respondents.

MILLARD, J.—This action was instituted to recover against Dean Witter and others, doing business under the partnership name of Dean Witter & Company, and John Brazier for damages alleged to have been sustained by reason of the failure of the defendants to execute plaintiff's order to cover her short sales in the grain market. Defendants denied that plaintiff ever ordered her short sales covered, and pleaded, as an affirmative defense, ratification of plaintiff's failure to execute the order, and further pleaded, affirmatively, accord and satisfaction in that, on May 23, 1940, plaintiff accepted from defendants $1,303.64 as the balance due to her in full. Trial of the cause to the court, sitting with a jury, resulted in verdict in favor of the defendants. From judgment entered on the verdict, motion for new trial having been overruled, plaintiff appealed.

The evidence is summarized as follows: Helen C. Gould is a resident of the city of Tacoma. Dean Witter and others conduct a brokerage partnership under the firm name of Dean Witter & Company. John M. Brazier is a customers' man in the employ of Dean Witter & Company. A customers' man is an employee of a brokerage house, who solicits from the investing public orders for the purchase and sale of commodities

and securities to be executed upon various commodities and securities exchanges in the United States. Appellant, having come into an inheritance, upon the recommendation of a friend, went to Seattle in August 1936, where she met Brazier at the office of the brokerage copartnership, and entered into a written agreement with Dean Witter & Company to open a margin account for the sale and purchase of securities. Paragraph 4 of that agreement, particularly stressed by respondents, reads as follows:

"That all transactions for or in connection with the account of the customer shall be deemed to be included in a single account, notwithstanding the fact that such transactions may be segregated into separate accounts on the books of the broker. The customer further agrees that all securities held by the broker shall be for the protection of all of the customer's indebtedness."

This means no more than that the securities account was pledged to pay any obligations which existed in other accounts as well as in the securities account. Under the terms of this agreement, respondents had the right to sell the securities to cover any indebtedness owing in any account appellant had with respondents, and appellant had to consent, of course, to this, in order not to lose, perhaps, some of the securities which she desired to retain.

Thereafter, appellant inherited the further sum of twenty-four thousand dollars. Following a conference with Brazier in Seattle, she added this money to the stock account, and made arrangements for the investment of this second legacy in securities. Some conversation was had with Brazier respecting opening a commodities account. It was agreed between appellant and respondents that the commodities account was not to exceed three thousand dollars. This commodities account was opened by transferring two

hundred dollars from the securities account to the commodities account. Brazier handled these accounts at all times subsequently.

By July, 1939, the commodities transactions had grown to very substantial proportions. Brazier sold grain short and also bought it long, so that, by August 1, 1939, appellant was short forty-five thousand bushels of grain. On August 7th, appellant went to Seattle and discussed with Braizer the subject of the condition of the commodities account. She insists that, at that time, she directed Braizer to get her out of the short position in the grain market as soon as he could, and not to increase it. Brazier admits that he had a general conversation with appellant at that time, but his version of the conversation is that appellant informed him that she would like to cover the shorts if she could with a profit, and it was agreed between them that, if the market went down, they would cover the short position, and, if the market went up, they would sell the long grains and carry the shorts.

There is no conflict in the evidence that, between August 7 and August 24, 1939, which was approximately a week prior to the commencement of the world war, Brazier increased appellant's short position in the grain market to eighty thousand bushels of various kinds of grain. These various transactions in the commodities market had been financed by the transfer of funds from appellant's securities account; that is, respondents made additional margin credits in the commodities account and charged an additional debit balance in the securities account, upon which it collected interest. Appellant admits receipt of statements showing the increase in this short position between August 7th and August 24th and that she did not do anything about it until August 24, 1939.

She claims that, after a family conference with her

husband and her son August 23, 1939, it was determined that, upon the following day, she would instruct the brokerage house to entirely cover her short position in the grain market; that is, to purchase eighty thousand bushels of grain at the market although this would have resulted in a loss to her of approximately forty-three hundred dollars. Appellant testified that she telephoned to Brazier about 10:25 a. m., August 24, 1939, from her home in Tacoma and told him that she was dissatisfied, and that she wanted to get rid of the whole short account. He called attention to the loss which she would sustain, but she told him that she would be absent from her home until Labor Day and that she did not want to worry about the grain market. She was very emphatic in her testimony that, at that time, she told Brazier definitely to get out of the short account. Appellant testified:

"I concluded I must definitely get rid of that short account, and by getting rid of the short account is the same thing as saying 'cover the short account,'—do you understand? Q. What, if any, action did you take on the 24th? A. I called Mr. Brazier on the phone. Q. About what time in the morning was it? A. Around 10:25. Q. You put in the call at the brokerage house of Dean Witter in Seattle? A. A person to person call to Mr. Brazier, and when he was available he called me. Q. Did you recognize his voice on the telephone? A. Yes. Q. Who was present besides yourself when you had that conversation. A. My son Clark was sitting on the bench and a neighbor, Mrs. Muir, who is in the court room. Q. Relate that conversation to the very best of your recollection. A. I called up Mr. Brazier, and I told him that I was very much dissatisfied with the way that he was handling things, that he had not done what he had agreed to do when I was over on the 7th, that instead of diminishing this account he had made it more, and that I had gotten to the point where I was not going to have it any more, and I wanted him to get rid of my whole short account. 'Why,' he said, 'Mrs. Gould,

do you know what it would cost you to cover that short account at the market?' And I said, 'No, but the family has figured it up,' the night before, 'and as nearly as we can tell, it would be almost $4000 that it would cost to get rid of it right then.' He said, 'It would be $4300. Now, you don't want to take a loss like that. There is no need of that.' He said, 'This situation is not going to continue. This market is due to start dropping any time as the tension over the war lessens, and we are sure that there is not going to be a war.' I said, 'Listen, my information on that is just about as good as yours. Dean Witter has no more chance to know about international things that the governments don't know themselves than I have. My information is just as good as yours. Now, I am going to be gone until after Labor Day, and I don't want to have to worry about this. Get me out of that short account.' And he started to argue, and I said I did not care what he thought, to get me out of that short account. I said, 'Get me out of those shorts and don't get me into anything more, and when I come back I am going to clean out my account.' Q. At that time were you on the long side of the market also? A. Yes, I had a long account, but you understand, while the long account had just about balanced the short account, pretty near, on the 7th, it was just about half as much,—I suppose about half as much as the short account, and there it was. I did not give him any definite order about the long account, because, you see, I was not afraid of that. That could not do anything terrible to me while I was gone, but the short account could. That was dynamite— Q. Well, did he finally— A. And so when I told him that when I came back I was going to clean out my account, that meant then I was going to get rid of my long account. I was going to get out of the market altogether. 'Well,' he said, 'you are the doctor, but you are making a big mistake.' I said, 'I can't help it if I am. Get me out of that account.' And I hung up."

Brazier admits that he had a conversation, August 24, 1939, with appellant respecting the advisability of covering the short position. He testified that he told

appellant that he did not think that she needed to take a loss of $4,375 by covering her short account, and that finally she told him to take the profits on the long wheat. He admits that she told him that she would be gone until Labor Day, or the day following. Brazier testified as follows:

"Mrs. Gould called me and asked me about the short accounts and we discussed at length the market at that time as well as the world conditions and I said to Mrs. Gould that I did not think she needed to take a loss of $4375 by covering her short account. She said she was going away and that she would be gone until Labor Day or the day after; and Mrs. Gould is capable of using a lot of words in a comparatively short time, and by the time the conversation was finished she had given me no order to buy eighty thousand bushels of wheat and the one reason being that it would be covered at a loss. She did say 'Go ahead and take the profits on the long wheat' which we were then holding, but she never gave me any order to buy eighty thousand bushels of wheat. If she had given me the order, it would have been executed."

The short position was not covered. Appellant departed from her home the morning of Friday, August 26th, and prior to arrival of her mail. She did not return to her home until late in the evening of a week from the following Saturday, which was the Saturday preceding Labor Day, and the commodities exchange and the brokerage office were closed until the succeeding Tuesday. She testified that she became alarmed when she examined her mail Sunday and found no confirmation slip from the broker. On Tuesday morning, which was after Labor Day, she received a monthly statement from the respondents, covering her August transactions, which apprised her that she was still short eighty thousand bushels of grain. By this time the European war had commenced, with the result that the price of wheat had risen so rapidly that the market

was, in brokers' parlance, "locked up." That is, the securities exchange had a rule that, if the price of grain increased more than a fixed number of cents in a day, no more could be sold at a price in excess of the limitation so fixed. The effect of the rule, during the three or four days after the beginning of the world war, was that persons who were short on the commodities market were unable to cover their commitments.

If appellant's account had been covered August 24th or 25th, she would have sustained a loss of $4,375. As it was not covered until after the war commenced and the market became "locked up"—it was covered about the middle of September—the actual loss sustained by appellant was $16,236.50. Appellant's action is to recover the difference between what the loss would have been had the short position been covered on August 24th or 25th and what the loss actually was.

In September, 1939, when the commodities account of appellant was finally closed, she had an equity of approximately fifty-seven hundred dollars in her securities account; that is, if the securities which the brokers were carrying for her on margin had been sold at that time at the then market price, appellant would have received about fifty-seven hundred dollars from the brokers without regard to the claim involved in this action.

Appellant first consulted attorneys in October, 1939, and, as a result of that consultation, her attorneys made demand upon respondents for damages resulting from respondents' failure to comply with appellant's order of August 24, 1939. As counsel were unable to secure an adjustment of the matter, they instituted this action March 18, 1940.

In May, 1940, while the case at bar was still pending, there was a swift depression in the securities market

which had the effect of reducing the so-called equity which the appellant had in that account. Respondents addressed a letter May 13, 1940, to appellant, requesting a remittance of eight hundred and fifty dollars, as there was not sufficient margin in her account to protect it. This letter, which was merely a demand for more margin, made no reference to appellant's claim for damages which was then pending in court. Appellant's attorneys replied May 14, 1940, by telegram reading as follows:

"Your demand Helen C. Gould additional margin received. For reasons stated in case of Gould vs your firm we take position that nothing is owing on account. Without waiving rights and insisting that no indebtedness exists we suggest sale of Letourneau stock in preference to other stocks listed. We refuse to make additional remittances."

It may be presumed that the Letourneau stocks were sold by respondents to provide additional margin, in view of the fact that, May 27, 1940, respondents made a demand for more margin. This was the same form letter as was used by respondents May 13, 1940, and it contained no reference to appellant's claim for damages. To this second letter appellant responded May 21, 1940, by telegram reading as follows:

"Without waiving any provision indicated by my lawyer in his previous telegram sell my holdings pay off my entire alleged indebtedness to Dean Witter send balance to me."

On May 24, 1940, appellant received check of Dean Witter & Company, dated May 23, 1940, payable to her in the amount of $1,303.64. A voucher was attached to this check, upon which was typewritten the words "Balance of account." Appellant retained this check until July 13, 1940, at which time she endorsed and cashed same. She testified that she did not cash it in

the sense that that was all that Dean Witter & Company owed her.

■ Error is first assigned on the giving of an instruction, as follows, respecting the affirmative defense of accord and satisfaction:

"You are instructed that on May 23, 1940, defendants paid plaintiff by check $1303.64, which check contained a statement showing the said sum as the balance due plaintiff to that date, and that plaintiff cashed this check on July 13, 1940. If you believe from a fair preponderance of the evidence that plaintiff accepted this check in full satisfaction of everything that transpired before this check was given to plaintiff, then your verdict must be for the defendants."

Respondents' check of May 23, 1940, in the amount of $1,303.64, was not tendered to appellant as payment of appellant's claim for damages then pending. The check was given to close out the transactions of the securities account of appellant. The cause of action was for damages for negligence in handling appellant's commodities account. In her last telegram, that of May 21, 1940, the appellant directed, as she had a perfect right to do, that respondents sell her securities and remit the balance to her. There was no meeting of the minds between her and respondents that, because she accepted the money which admittedly was due to her, she was releasing the action for damages which was then pending. She and her attorneys definitely, specifically, and positively, in language that cannot be misunderstood, advised respondents that, in closing the securities account, appellant did not consent to a release of the pending action. To create an accord and satisfaction in law, there must be a meeting of minds of the parties upon the subject, and an intention on the part of both to make such an agreement. *Graham v. New York Life Ins. Co.*, 182 Wash.

612, 47 P. (2d) 1029. There was no issue of accord and satisfaction to submit to the jury.

■■ Appellant next assigns as error the giving of an instruction which authorized the jury to find that appellant did not definitely instruct the respondents August 24, 1939, to cover appellant's short commodities sales on that date; or, in the alternative, to find that, if appellant did so instruct the respondents, but if the instructions given by appellant were not understood by respondents, to find for the respondents.

In the first part of the instruction, the jury was charged that:

"If you find from a fair preponderance of the evidence that plaintiff [appellant] did not definitely instruct the defendants [respondents] on August 24, 1939, to cover plaintiff's [appellant's] short commodity sales on that date; . . . then your verdict must be for the defendants [respondents]."

Counsel for appellant concede that the foregoing portion of the instruction was substantially correct, but argue that the error consists in the following language of the instruction after the word "date":

" . . . or if you find from a fair preponderance of the evidence that plaintiff did so instruct the defendants [respondents] but that the instructions were so given that a person of reasonable prudence and discretion would not have understood them; . . . then your verdict must be for the defendants [respondents]."

If appellant customer had given an order to respondent brokers which was susceptible of two constructions, appellant would not be in a position to complain if respondents in good faith adopted a construction of the order which subsequently proved to be adverse to the interests of appellant. No such situation is presented in the case at bar. We have quoted above the testimony of appellant and the testimony of Brazier

respecting the order. Clearly, there is no basis for charging the jury that it could believe the testimony and still find it could not be understood by a person of reasonable prudence and discretion. In other words, the jury was authorized, even if it believed the appellant's testimony, to disregard it by the application of some new rule of "reasonable prudence and discretion," when under the evidence there plainly was no misunderstanding.

The issue between Brazier and appellant was simply one of veracity. Brazier did not testify as to an order which was capable of two interpretations. He takes definite issue with appellant. He admits that she discussed with him the desirability of covering the short position, and he admits her statement that he told her that he did not think it was necessary for her to take a loss. He admits that she told him that she was going away and that she would be absent until Labor Day or the succeeding day. There is only one point in which appellant and Brazier differ, and that is she testified that she ordered him to cover the shorts, while he insists that she gave him no order to cover the shorts, but told him to go ahead and take the profits on the long position. Either appellant, as she testified, instructed Brazier to get her out of the short position, or Brazier was telling the truth when he testified that she did not give to him any such order.

The instruction was prejudicially erroneous, in that the court thereby submitted to the jury a question when there was no substantial evidence upon which to base the instruction. *Neeley v. Bock,* 184 Wash. 135, 50 P. (2d) 524.

The argument of respondents that there was a ratification by appellant, as a matter of law, of respondents' disregard of her order of August 24, 1939, is without substantial merit. At most, the question of

ratification was possibly one for the jury, but the record before us does not establish ratification as a matter of law.

The judgment is reversed, and the cause remanded with direction to the trial court to grant a new trial.

ROBINSON, C. J., MAIN, STEINERT, and DRIVER, JJ., concur.

